Filed 5/25/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C071195 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF102016) |
| v. | |
| SALVADOR BENJAMIN VASQUEZ, JR., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Yolo County, Stephen L. Mock, Judge. Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant Salvador Benjamin Vasquez, Jr. Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant Jose Antonio Duran. Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Vincent Sisneros.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Kenneth N. Sokoler and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts one through nine and 11 of the Discussion.

1

While repeatedly shouting "Nortes" or "Nortenos," defendants Salvador Benjamin Vasquez, Jr., Jose Antonio Duran, and Joseph Vincent Sisneros violently assaulted and robbed a stranger in a business parking lot and then threatened or attacked several employees who witnessed the beating and called police. They were tried jointly and were each convicted of multiple offenses with related enhancements, as noted, *post*.

With each defendant joining in material contentions of the others to the extent they are relevant, defendants raise numerous purported errors on appeal. They first argue (1) as to their Penal Code section 136.1 convictions (undesignated section references are to the Penal Code), the jury never found that Sisneros and Duran used force or the threat of force or violence to dissuade a witness; (2) Sisneros' and Duran's respective counsel were ineffective for failing to object to the section 136.1 force or violence special finding; and that (3) insufficient evidence supports their section 136.1, subdivision (c)(1) convictions.

Defendants next claim the court erred (4) by denying their motion to dismiss the entire jury panel, and (5) in imposing multiple punishments for the second degree robbery and dissuading a witness convictions contrary to section 654's prohibitions.

Finally, defendants raise several claims regarding the gang evidence admitted below as well as the sufficiency of the evidence to support the charged gang offenses and enhancements. They argue the court erred in admitting evidence of Duran's juvenile robbery adjudication through expert testimony because (6) it was more prejudicial than probative under Evidence Code section 352; and (7) it violated their Sixth Amendment right to confront witnesses. They further contend the court erred in (8) allowing the gang expert to opine on the specific intent of hypothetical gang members; (9) that their responses to jail booking questions regarding gang membership were inadmissible; (10) that insufficient evidence establishes the existence of a "criminal street gang" under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), thus requiring reversal of their substantive gang offense convictions as well as all of the attached gang enhancements;

2

and (11) that insufficient evidence shows they "actively participat[ed]" in a criminal street gang under section 186.22, subdivision (a).

We affirm the judgments.

FACTS AND PROCEEDINGS

## The Assault and Robbery of Noah Fordyce

After getting off work around 10:00 p.m. on April 19, 2010, Noah Fordyce purchased some nachos and drove to the Lowe's parking lot in West Sacramento. He parked and began eating while he watched a show on his iPod. The driver's side window of his car was down, and Fordyce's seatbelt was still buckled.

A red car occupied by several men pulled into the parking lot and parked behind Fordyce's car. Three men got out of the red car and came to Fordyce's driver's side window. They told him they had been drinking, and one of the men grabbed a nacho chip from Fordyce's food. The three men then returned to their car.

A few minutes later, the three men returned to Fordyce's window. One man reached in and grabbed Fordyce's iPod. The men began taking turns violently punching Fordyce in the head. While doing so, the men yelled out "Los Nortenos" or "Los Nortes" multiple times. One of the men said he had a knife. They demanded Fordyce's wallet and keys. Fordyce did not fight back and tried to cover his head from the blows, which continued even after he gave them his wallet and keys. During the assault, Fordyce's nachos were smeared on the inside and outside of his vehicle. Among other injuries, Fordyce suffered two facial bone fractures in the unprovoked attack.

## The Assault of Carlos Lozano

While the three men were taking turns hitting Fordyce, four Lowe's employees, Rick Deanda, Chantelle Parr, Camden Cushing, and Carlos Lozano, walked out of the Lowe's store, which was closing. They immediately noticed a commotion and yelling coming from the direction of Fordyce's vehicle. They saw three men attacking Fordyce

3

through his car window. One man was wearing a black sweatshirt or shirt, another was wearing a white hooded sweatshirt, and the third man was wearing a white shirt.

Deanda, the store manager, instructed the employees to stay away and to call the police. Deanda heard the word "Norte" yelled out during the attack on Fordyce.

Cushing called 911 to report the attack. While Cushing was on the phone with the 911 operator, one of the men accosting Fordyce noticed him on the phone and yelled out that Cushing was "calling the cops." The three men then got into their car and sped quickly towards Cushing. The man wearing the white hooded sweatshirt was driving. While the three men were distracted by the Lowe's employees, Fordyce got out of his car and ran to hide by the Lowe's store.

Cushing stepped behind a nearby light pole to put something between him and the car. After the car abruptly stopped, the three men jumped out and began yelling at Cushing, asking him, "You calling the cops on us, fucking Nigga, fucking Norte?" All three men were yelling at Cushing. The man wearing the black sweatshirt told Cushing, "I'll fucking shoot you. I got a fucking gun, Nigga. I'll fucking shoot you. You calling the cops on me?" Cushing saw the man holding a dark object near his waistband, which Cushing thought was a gun. While the man was threatening him, the other two men began running towards Cushing. Cushing turned and ran towards the parking lot exit.

Lozano was standing a short distance behind Cushing at the time. Frightened, Lozano stood still and put up his hands to signal that he did not want any problems. The two men chasing Cushing, however, began attacking Lozano instead. They kicked and punched him in the chest and face. The man wearing the black sweatshirt stood back while the other two men attacked Lozano. Lozano heard someone yell, "Norteno." The men eventually stopped assaulting Lozano, got into their car, and drove away. As a result of the attack, Lozano suffered injuries to his nose, eyes, and face.

Parr walked quickly towards her car. She heard one of the men screaming that he was "going kill this nigga," and another yelling "Norte." She saw the three men get into

4

their car and drive towards Cushing and Lozano. She saw at least two of the three men attack Lozano. She drove out of the parking lot and then pulled over to call the police. While leaving, she saw two other men standing on the road near the parking lot exit. One was wearing a dark shirt and long jeans shorts, and the other was wearing a white shirt with a cartoon figure on it.

As Parr was on the phone with the police, she saw the red car drive by on the street. The man in the white hooded sweatshirt was driving, and the man with the white cartoon shirt, whom Parr had seen on the side of the road, was also in the car.

Minutes later, an officer called to the location of the assaults passed a red car matching the description of the suspects' vehicle. The officer stopped the car and saw the passenger in the back seat on the right moving around and throwing things out of the window. Luis Vasquez, defendant Vasquez's brother, was sitting in the right rear passenger seat. Duran was driving the car, and Vasquez was sitting in the front passenger seat. Ryan Boyd, also known Ryan White or Derek White, was sitting in the center of the back seat, and Sisneros was sitting in the left rear passenger seat.

At the time, Duran was wearing a white hooded sweatshirt and was carrying a knife. Sisneros was wearing a white shirt that had a nacho cheese stain on the front. Vasquez was wearing a black shirt, which may have had the sleeves pushed up. Luis Vasquez was wearing a black sweater, and Ryan Boyd was wearing a white shirt with a cartoon logo on it. None of the men had changed their clothes since being arrested.

Upon searching the car, authorities found Fordyce's iPod and wallet which were located on the floorboard under the driver's seat. A pair of jean shorts with a red belt were in the backseat.

Witness Identifications and Police Interrogations

The suspects were taken to a nearby location for a "field showup." Fordyce was unable to identify any of the men, but did identify the red car as the one in which his

5

attackers were riding. Cushing identified Duran, Vasquez, and Sisneros as the men who attacked Fordyce and Lozano. Parr identified Duran and Vasquez as two of the primary assailants. She also identified Duran as the driver of the red car. Lozano identified Duran, Vasquez, and Sisneros as the men who assaulted him.

Thereafter, the police interviewed each defendant separately on videotape following standard *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).) The interviews of Sisneros and Duran were played for the jury; the court prohibited the People from playing Vasquez's taped interview because he invoked his *Miranda* rights when the interview began.

Sisneros told police he was passed out drunk in the back seat of Duran's car during the attack and that he never hit anyone. He could not explain how the nacho cheese stain got on his shirt. When asked why his left hand was bruised and swollen, Sisneros, who was left handed, claimed his knuckles always looked that way.

In response to the interrogating officer's statement, "So, you're a norteno," Sisneros stated, "If I was to get locked up, I'd ride with northerners, yeah." Sisneros also told the officer that his "family was always northerner," and that he "just hood bang[s]." After the officer asked him whether he was a Norteno from Del Paso Heights, Sisneros responded that if he were "representing" himself, he "would go as a northerner, yeah. Northerner from the heights." Sisneros also admitted he knew Frank White, a well-documented Norteno gang member.

Duran admitted the red car was his and that he was driving the car that night. When asked how long he had been a Norteno, Duran responded, "Who said I was?" The officer then told Duran that apparently he had admitted being a Norteno gang member to someone in Sacramento. Duran also said he was "not proud of it" in response to the officer's question of whether he was proud of being a Norteno. He later denied being a gang member, however, and said he was not with any particular Norteno crew. When asked why his hands and knuckles were bruised, Duran claimed that his hands always

6

looked that way.  Towards the end of the interview, Duran yelled out "Norte" while attempting to communicate with another suspect in the room next door.

Trial Proceedings

A December 2010 information charged Duran, Vasquez, and Sisneros with the following:  conspiracy to commit robbery (§ 182, subd. (a)(1) [count 1]), second degree robbery (§ 211 [count 2]), battery with serious bodily injury of Fordyce (§ 243, subd. (d) [count 3]), assault with force likely to cause great bodily injury of Fordyce (§ 245, subd. (a)(1) [count 4]), dissuading a witness (§ 136.1, subd. (c)(1) [count 5]), criminal threats against Cushing (§ 422 [count 6]), assault with force likely to cause great bodily injury of Cushing (§ 245, subd. (a)(1) [count 7]), battery with serious bodily injury of Lozano (§ 243, subd. (d) [count 8]), assault with force likely to cause great bodily injury of Lozano (§ 245, subd. (a)(1) [count 9]), criminal threats against Lozano (§ 422 [count 10]), and active participation in a criminal street gang (§ 186.22, subd. (a) [count 11]). Duran was charged individually in count 12 with drawing and exhibiting a deadly weapon other than a firearm in furtherance of criminal street gang activity, but this count was later dismissed.  (§§ 186.22, subd.(d), 417, subd. (a)(1).)

Several enhancements were alleged relating to the substantive offenses.  For counts 1 through 10, the information alleged defendants had committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).)  For counts 1, 2, 4 and 9, it was further alleged that all three defendants inflicted great bodily injury when they committed the charged offenses. (§ 12022.7, subd. (a).)  And, for counts 2, 5, and 7, it was alleged Duran personally used a deadly weapon.  (§ 12022, subd. (b)(1).)  Defendants pleaded not guilty to all of the charges and enhancements.

*The Prosecution Case*

At trial, Fordyce, Deanda, Cushing, Lozano, and Parr testified about the above-described events. Fordyce testified that the three men shouted out "Los Nortenos" or "Los Nortes" in a way that Fordyce was supposed to remember it.

Parr testified she was familiar with gangs having grown up in a neighborhood with numerous Norteno gang members, and understood the term "Norte" to be a gang related term that referred to the Norteno criminal street gang. She feared retaliation for testifying. Although she had identified Duran as the car driver wearing the white hooded sweatshirt and Vasquez as the man wearing the black shirt and jeans who were two of the primary assailants during the field line-up at the time of the incident, she was unable to identify any of the defendants at the time of trial.

Cushing, who was a military police officer, was also familiar with the term "Norte" from gang training he received from the FBI and the Department of Homeland Security. Based on his training, he believed the attacks on Fordyce and Lozano were gang related. He was afraid to testify because he feared gang retaliation.

At trial, Cushing identified all three defendants as the men who attacked Fordyce and Lozano. He specifically identified Vasquez as the man wearing the black sweatshirt who threatened to shoot him. Similarly, Lozano testified that Vasquez was the man in black who threatened to shoot him and Cushing. He identified Duran and Sisneros as the men who actually punched and kicked him. At the time of the attack, Lozano understood the term "Norteno" to be gang related, and he felt increased fear and intimidation as a result.

Detective John Sample, a veteran officer with the Sacramento Police Department, testified as the People's gang expert. Detective Sample had investigated hundreds of Hispanic criminal street gang crimes, and talked with or otherwise came in contact with Hispanic gang members on a daily basis. He had received specialized training in

Hispanic criminal street gangs throughout his law enforcement career, and predominantly investigated the Norteno and Sureno criminal street gangs. He also talked with other officers about gang issues, reviewed gang reports from other jurisdictions, and reviewed field identification cards identifying gang members in the Sacramento area.

Detective Sample testified regarding Hispanic criminal street gangs generally, and about the "primary activities" of the Norteno gang specifically, including murder, assault with a deadly weapon, robbery, narcotics trafficking, firearms offenses, and weapons violations. The Norteno criminal street gang originated from a prison gang called Nuestra Familia. There are approximately 1,500 validated Norteno gang members in the Sacramento region, generally organized into sets or subsets based on the neighborhoods in which the gang members live. Some of these subsets include the Richardson Village Nortenos and Del Paso Heights Nortenos in North Sacramento as well as the Broderick Boys in West Sacramento, among several others.

These different Norteno subsets often hang out together and commit crimes together, including Richardson Village Nortenos and Norteno gang members from West Sacramento. According to Detective Sample, a Norteno gang member's first allegiance is to the Norteno gang itself, aside from their set or subset. Thus, a crime committed by a Del Paso Heights Norteno or a West Sacramento Broderick Boys benefits not only the other Norteno subsets but also the larger Norteno criminal street gang as a whole.

Common Norteno gang signs and symbols among all subsets of Nortenos include the color red, the words Norte or Northerner, the letter N, which is the fourteenth letter of the alphabet, the number 14 or any variation of that number including the numbers one and four, roman numerals XIV, or one dot and four dots. Norteno gang members often use hand signs to show their gang affiliation.

Detective Sample testified that in gang culture, respect is like street currency. Respect in a gang is obtained by committing crimes and other acts of fear or intimidation. Gang members "put in work" for the gang, meaning they commit crimes, to show their

9

loyalty to the gang and to raise their status within the gang. Violent gang crimes intimidate members of the community from reporting crimes, which allows gangs to operate without inhibition.

Detective Sample opined that Sisneros, Vasquez, and Duran were all active Norteno criminal street gang members. He based his opinion about Sisneros on several factors, including that Sisneros was involved in the present crimes, which Detective Sample believed were gang-related. Sisneros had also been found in the company of other Norteno gang members on multiple occasions, was documented wearing red gang-related clothing, and he admitted during the police investigation of the charged crimes that he "hood bangs" with Northerners and that his family members were Norteno gang members. Detective Sample also considered Sisneros' responses to jail classification questions where he said he hangs with Northerners, although he denied being a gang member.

For Vasquez, Detective Sample noted that the Sacramento Police Department had contacted him on multiple occasions associating with Norteno gang members, including during a 2009 homicide investigation. During those contacts, Vasquez was wearing red clothing consistent with Norteno-style dress. Vasquez had a tattoo on his chest of the letters "RVN," which Vasquez admitted stood for the Richardson Village Nortenos, a Norteno subset from Del Paso Heights. Three months before the attacks on Fordyce and Lozano, Vasquez had been shot three times while attending a gang-related party. In response to jail booking questions, Vasquez said he hangs with Northerners, although, like Sisneros, Vasquez denied any gang affiliation.

Photographs of Vasquez with other Norteno gang members, including one with Ryan Boyd (also known as Ryan White or Derek White) who was arrested with defendants, were posted on Vasquez's personal MySpace webpage as well as on a Richardson Village Norteno MySpace webpage. Some of the photographs depict Richardson Village Nortenos together with Norteno gang members from West

10

Sacramento. Vasquez and the others are wearing red clothing and throwing gang signs with their hands. Several of the pictures were taken at the funeral of documented Norteno gang member, Frank White.

Finally, in opining Vasquez was an active member of the Norteno criminal street gang, Detective Sample considered a jail incident that occurred while Vasquez was awaiting trial. Vasquez appeared to give a small, written jail communication known as a "kite" to another inmate. The jail kite contained information about Norteno "curriculum" that included a structured training process for the gang.

Detective Sample testified that he had seen other confiscated kites, in both jail and prison, showing Norteno rosters of gang members within the facilities. Some kite rosters listed both Richardson Village Nortenos and Del Paso Heights Nortenos together.

For Duran, Detective Sample cited his "yes" answer on the jail classification questionnaire in response to a question asking if he had any gang affiliation. Duran listed "Northerner" on the form. While Duran was awaiting trial on the present charges, he and several other incarcerated Norteno gang members assaulted another jail inmate who wanted to drop out of the Norteno gang.

In concluding Duran was an active gang member, Detective Sample also considered the circumstances surrounding Duran's juvenile adjudication for robbery with a firearm. Duran and several Norteno gang members tied a man, used derogatory terms for a rival Sureno gang member, and threatened to kill him if he did not give them his ATM card and PIN number to withdraw money from the man's bank account. The investigation into the crime revealed the motive for the robbery was to obtain money to post bail for a Norteno gang member who had been arrested for stealing a car. Defendant was arrested in a house with Norteno gang graffiti and was wearing red clothing at the time. He also told investigators that he only hangs out with Norteno gang members.

The other two men who were in the car when defendants were arrested, Ryan Boyd and Luis Vasquez, were also Norteno gang members in Detective Sample's

11

opinion. Boyd's gang monikers were Ryno or Chap or Chappy, and he had been contacted by the police on numerous occasions associating with known Norteno gang members while wearing a red bandana, an item commonly worn by Norteno gang members. Detective Sample knew Boyd through other criminal gang investigations and had written several reports about him. Boyd was the victim of a gang-related stabbing. Searches of his residence revealed Norteno gang graffiti, and Boyd's mother told Detective Sample that Boyd considers himself a Norteno. He also appeared in photographs with other Norteno gang members, including one picture in which Vasquez was seen throwing gang signs.

Luis Vasquez, defendant Vasquez's brother, had been documented by the Sacramento Police Department in multiple reports as associating with known Norteno gang members. He was photographed wearing red gang clothing, and, like his brother, the letters "RVN" were tattooed across his stomach.

The prosecution presented evidence of three predicate offenses during trial. The first predicate offense, known as the Memorial Park incident, occurred in March 2010. Two brothers were assaulted by multiple Norteno gang members in a West Sacramento park. One of the brothers was hit in the head with a hammer while the other was chased down and severely beaten. During the attack the Norteno gang members yelled out "Broderick," referring to the West Sacramento "Broderick Boys" Norteno subset.

The second predicate offense occurred when the same Norteno gang members involved in the Memorial Park incident tried to later intimidate the brothers and their family members by driving by their house while making shooting motions and threats. At least one of the gang members was convicted of committing an assault with a deadly weapon or with force likely to produce great bodily injury (§ 245).

Detective Sample testified about a third predicate offense, a murder committed by a validated Norteno gang member in 2007. The Norteno gang member was not affiliated

12

with any particular Norteno set when he shot and killed an individual whom he believed was a rival gang member.

The prosecutor posed several hypothetical questions to Detective Sample tracking the evidence presented in the case. Detective Sample opined that the hypothetical crimes as described, including that the persons shouted "Norte" during the robbery and assaults, would benefit or promote the Norteno criminal street gang by informing the victims who was committing the crimes and that the gang members were violent. This would intimidate the witnesses and instill fear in the community, making it less likely the crimes would be reported. Over defense objections, the prosecutor also asked Detective Sample whether the hypothetical gang members involved in such crimes intended to further or assist the criminal street gang. Detective Sample responded that the hypothetical defendants, in his opinion, would intend their actions to promote or assist the gang.

### The Defense Case

None of the defendants testified. During closing, Duran's counsel argued the crimes were not gang related, but rather crimes of opportunity committed by a group of young people who had been partying but not otherwise associating as Norteno gang members. Similarly, Sisneros characterized defendants as a group of drunken young people who simply committed a crime of opportunity. Although his counsel acknowledged that Sisneros "ran with the Northerners," he denied the offenses were committed on behalf of the Norteno criminal street gang. Vasquez's counsel conceded that three men had committed various crimes, but argued that those men were Duran, Sisneros, and Luis Vasquez--not defendant Vasquez. He also argued that the crimes were not gang related.

### The Verdicts

Before the jury began deliberating, the prosecution dismissed count 12 against Duran as well as the special allegations attached to counts 2 and 5 that Duran personally

13

used a deadly or dangerous weapon when robbing Fordyce and dissuading Cushing from reporting the crime. The jury acquitted each of the defendants of one count of assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(1) [count 7].) And Duran and Sisneros were acquitted of two counts of criminal threats. (§ 422 [counts 6 and 10].)

The jury convicted each defendant of dissuading a witness in count 5. The jury also found true the special findings for count 5 regarding using force or the threat of force to dissuade a witness. The three special finding forms include a caption identifying the individual defendant to whom each specific form applied. The text of all three forms, however, refers to Vasquez's name only. The jury convicted defendants of all other charges and found the attached enhancement allegations true, including the gang enhancements alleged under section 186.22, subdivision (b)(1).

The court sentenced Vasquez to an aggregate prison term of 25 years four months to life. Duran was sentenced to an aggregate 28 years eight months to life in prison, and Sisneros to an aggregate prison term of 22 years to life.

DISCUSSION

I

*Special Findings for Section 136.1 Convictions*

Sisneros and Duran first argue that the jury did not find true the special finding attached to count 5 that they dissuaded Cushing from reporting the attack on Fordyce by using force, violence, or the threat of force or violence. In the absence of such a finding, they contend the court erred in sentencing them to an indeterminate term of seven years to life under section 186.22, subdivision (b)(4)(C).

" ' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." [Citations.]' " (*People v. Jones* (1997) 58 Cal.App.4th 693, 710.) " 'The form of a verdict is immaterial

14

provided the intention to convict of the crime charged is unmistakably expressed.' [Citation.]" (*Ibid.*) " '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]' " (*Id.* at pp. 710-711.)

In this case, the information charged each defendant with violating section 136.1, subdivision (c)(1) by dissuading Cushing, who witnessed defendants viciously attacking Fordyce, from reporting the crime to police. The information specifically alleged that *all three defendants* dissuaded Cushing "by force, and by the express and implied threat of force and violence . . . ."

The court instructed the jury that if jurors found defendants guilty of intimidating a witness in violation of section 136.1, subdivision (c)(1), then jurors had to decide whether the People had proved the additional allegation that defendants used or threatened to use force when doing so. To prove this allegation, the court instructed the jury that the People had to "prove that the defendant used or threatened, either directly or indirectly, to use force or violence on the person or property of a witness or any other person."

The court further instructed the jury that it "must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately. If you cannot reach a verdict on all of the defendants, or on any of the charges against any defendant, you must report your disagreement to the court and you must return your verdict on any defendant or charge on which you have unanimously agreed. [¶] Unless I tell you otherwise, all instructions apply to each defendant."

The jury received separate written verdict forms relating to dissuading a witness as alleged in count 5 for each defendant. Each verdict form included a caption identifying the individual defendant to whom the respective verdict form applied. The jury marked the guilty box on each defendant's respective verdict form for count 5.

15

The jury also received separate written special finding forms for each defendant on count 5. As with the count 5 verdict forms, each special finding form includes a caption identifying the individual defendant to whom the respective special finding form applied. Each special finding form contained the following text:

"We, the Jury sworn to try the above-entitled case, find the special finding that the Defendant SALVADOR BENJAMIN VASQUEZ JR, committed the felony charged in Count 5, that the felony violation of Penal Code [section] 136.1 was malicious and done with force or violence or the threat of force or violence as required by California Penal Code 136.1(c) to be:

"[X] TRUE [ ] NOT TRUE."

Thus, although there is a count 5 special finding form separately captioned for each defendant, the text of each of the three forms refers to defendant Vasquez only.

Duran and Sisneros cite the above textual language in arguing that the jury did not find that they used force or violence or threatened to use force or violence when intimidating Cushing. In other words, they implicitly argue that the jury made the special finding three separate times as to Vasquez, but never as to either of them even though their names individually appear in the caption on the special finding forms.

We believe, however, that the record reveals an obvious error in the written special finding forms for Duran and Sisneros. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [court may disregard technically defective verdict form where jury's intent to convict clear and the accused suffered no prejudice].) First, there would be no need for the jury to make the identical special finding for Vasquez three separate times. Second, nothing in the record shows that the jury could not reach a decision on the special finding regarding the use of force or threat of force alleged against Duran and Sisneros in the information. Had they been unable to reach a consensus on the special finding as to those two defendants, the jury undoubtedly would have informed the court in accordance with the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are

16

presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

While deliberating, the jury also posed a question to the court about the count 5 verdict and special finding forms. It asked why there were two verdict forms for count 5. The court explained, "*You should find in your packets verdict forms for all three defendants for Count 5, two of them. One is styled the verdict form and one is styled a special finding form.* The verdict form is the form you use in determining whether the evidence shows beyond a reasonable doubt that any or all of the defendants are guilty of the crime charged in Count 5, which is intimidating a witness. . . .[¶] If you find any of the defendants guilty of the crime charged in Count 5, only then do you have to determine whether the special finding applies." (Emphasis added.)

The court's response to the jury's question makes clear that one verdict form and one special finding form applied to *each* defendant, and not, as Duran and Sisneros argue, that one verdict form applied to each defendant and three special finding forms applied to Vasquez.

The jury, moreover, orally confirmed its decision on the count 5 special findings in court. After reading the guilty verdicts on count 5 as to each defendant, the court read the jury's special findings attached to that count and asked the jury foreperson to orally confirm the findings. The following exchange took place between the court and the jury foreperson:

"THE COURT: It is a special finding. [¶] Count 5, the guilty verdict for dissuading a witness with a special finding now for Count 5 that it was malicious and done with force or violence or the threat of force or violence, the special finding as to Mr. Vasquez is true, dated the 24th signed by the foreperson. [¶] Is that special finding the special finding of the entire jury?

"JUROR NO. 6 [FOREPERSON]: Yes.

17

"THE COURT: The same special finding regarding Mr. Duran, true, dated the 24th signed by the foreperson. [¶] Is that the special finding of the entire jury?

"JUROR NO. 6 [FOREPERSON]: Yes.

"THE COURT: And the same for Mr. Sisneros, Count 5, special finding, it is true, dated the 24th and signed by the foreperson. [¶] Is that the special finding of the entire jury?

"JUROR NO. 6 [FOREPERSON]: Yes."

After the verdicts and special findings were read, each juror individually confirmed that the court had correctly read the jury's verdicts and special findings.

Duran and Sisneros' argument that the jury's oral confirmation does not provide clarity on the jury's true intent regarding the special finding is without merit. It is irrelevant that the judge who presided over taking the jury's verdicts was not the judge who presided over the trial. Duran and Sisneros' counsel, moreover, agreed that the substitute judge need not read each verdict or special finding form verbatim. The court specifically asked whether it could, for each count, read one verdict or special finding form and then characterize the remaining forms to identify what was happening by count, charge, and verdict. All counsel acquiesced in the court's proposed procedure.

On this record, we conclude that the jury's intent to find the count 5 special finding true for each defendant unmistakable. Duran and Sisneros, thus, did not receive an unauthorized life sentence for dissuading a witness by force or threat of force convictions.

## II

### *Ineffective Assistance of Counsel*

Duran and Sisneros next contend that their counsel was ineffective for failing to object to the life sentence imposed for their count 5 witness dissuasion convictions because, in their view, the jury did not find the attached force or threat of force special

18

finding true. Defendants specifically argue that their counsel should have raised a *Cunningham/Blakely/Apprendi* objection to the indeterminate life term imposed for count 5. (*Cunningham v. California* (2007) 549 U.S. 270, 274-275 [166 L.Ed.2d 856]; *Blakely v. Washington* (2004) 542 U.S. 296, 303-304 [159 L.Ed.2d 403]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435] [any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt].)

In light of our contrary conclusion that the jury did in fact find the special finding true as to both Duran and Sisneros, their counsel was not ineffective for failing to object to the sentences imposed on that basis. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 [trial counsel has no duty to raise an unmeritorious or futile objection].) No doubt counsel did not object to the sentence because each understood that the jury had, in fact, convicted their clients of dissuading a witness by force or threat of force or violence as we have concluded above. We therefore reject their ineffective assistance of counsel claims.

### III

*Substantial Evidence Supports Defendants' Section 136.1 Convictions*

Defendants Sisneros and Duran contend insufficient evidence supports their convictions for using force or the threat of force or violence to dissuade Cushing from reporting the assault on Fordyce to authorities. They claim they neither directly used or threatened to use force against Cushing to stop him from reporting the crimes, nor aided or abetted Vasquez in doing so.

When considering a sufficiency of the evidence challenge, we must " ' "review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence--i.e., evidence that is credible and of solid value--from which a rational trier of fact could have found the defendant guilty beyond a reasonable

19

doubt." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848-849 (*Hill*).) We may not reweigh the evidence or substitute our judgment for that of the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "[O]ur opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*Hill* at p. 849.) Reversal for insufficient evidence is warranted only where it clearly appears that upon no hypothesis whatever is there sufficient evidence to support a conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Massie* (2006) 142 Cal.App.4th 365, 371 (*Massie*).)

Section 136.1 prohibits someone from dissuading or attempting to dissuade a witness or victim from reporting a crime, or from attending or testifying at trial. (§ 136.1, subds. (a)-(b).) Where such conduct is accompanied by force or an express or implied threat of force or violence, the violation is a felony. (§ 136.1, subd. (c)(1).)

To prove defendants guilty of violating section 136.1, subdivision (c)(1), the People had to establish: (1) defendants knowingly and maliciously tried to prevent or discourage Cushing from reporting to law enforcement that Fordyce was a crime victim, or (2) defendants knowingly and maliciously tried to prevent or discourage Cushing from causing or seeking the arrest of someone in connection with the crimes against Fordyce; (3) Cushing was a witness or crime victim; and (4) defendants used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness or any other person. (§ 136.1, subds. (a)-(c).)

The record contains ample evidence supporting each of the defendants' convictions for violating section 136.1, subdivision (c). Evidence at trial showed the following: While defendants were beating Fordyce, one of them noticed Cushing on the phone and yelled out to alert the others that Cushing was likely calling the police. All three defendants immediately got into Duran's car and sped across the parking lot to where Cushing and Lozano were standing. Vasquez jumped out of the car, and using

20

derogatory and threatening language, asked Cushing if he was calling the police. Vasquez threatened to shoot Cushing and intimated he had a weapon in his waistband.

At the same time, Duran and Sisneros also got out of the car. While Vasquez threatened to shoot Cushing, Duran and Sisneros charged at Cushing and began chasing him. Having just witnessed all three men attacking Fordyce, Cushing fled for safety. After Duran and Sisneros gave up chasing Cushing, they turned their attention to Lozano, who happened to be standing with Cushing when he was calling the police. Both Duran and Sisneros viciously attacked Lozano, kicking and punching him in the head and chest.

It is undisputed that Cushing witnessed defendants attacking Fordyce. By immediately getting in their car after noticing Cushing on the phone, racing towards Cushing in their vehicle, and jumping out to confront Cushing, the jury reasonably could have found that defendants were trying to stop Cushing from reporting the crime.

Vasquez's verbal threats to shoot Cushing for calling the police clearly qualify as an express threat of force or violence. And, the jury reasonably could have determined that Duran and Sisneros' actions of chasing Cushing while he was on the phone constituted an express or implied threat to use force or violence to stop Cushing from calling the police.

Duran and Sisneros cite their acquittals of making terrorist threats under section 422 as additional proof that there is insufficient evidence to support their dissuading a witness by force convictions. Section 422 requires a verbal or written statement threatening to commit a crime resulting in death or serious bodily injury, however. (§ 422, subd. (a).) Section 136.1, subdivision (c)(1), by contrast, requires no such verbal or written statement. (§ 136.1, subd. (c)(1).) Duran and Sisneros' conduct of chasing Cushing, even though nonverbal, sufficiently conveys an implied threat of force or violence for purposes of section 136.1, subdivision (c)(1), especially when their cohort was verbally threatening to shoot Cushing.

21

The fact that Duran was acquitted of assaulting Cushing with a deadly weapon--his car--is also not persuasive. The jury could have reasonably found Duran impliedly threatened to use force or violence against Cushing to stop him from reporting the crime based on Duran's actions of jumping out of the car and chasing Cushing while he was on the phone.

Similarly, Duran and Sisneros' reliance on *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*), for the proposition that witness intimidation is not a natural and probable consequence of robbery, or to show that they did not aid and abet Vasquez in verbally threatening Cushing is unavailing. Sufficient evidence shows both Duran and Sisneros chased after Cushing, which actions carry an implicit threat of violence or force under the circumstances. Reversal of the dissuading a witness convictions under section 136.1, subdivision (c)(1) is therefore unwarranted.

IV

*Motion to Dismiss Jury Panel*

Defendants contend the court erred in failing to dismiss the entire jury venire based on one prospective juror's abbreviated statement during voir dire. The statement occurred during the following exchange with Duran's counsel: "Now, also you indicated in your questionnaire about this, right, that you believe that the defendant's [*sic*] have prior juvenile records, and they're linked with gang activity, and this has something to do about and [*sic*] Ipod; is that right? Now, what makes you believe that any of this is [*sic*] young people?" The prospective juror responded, "Well, I looked up yesterday and I--." Vasquez's counsel interrupted the exchange with an objection, which the court sustained, and the potential juror was not permitted to finish her statement.

Outside the presence of the jury panel, Vasquez's counsel moved to dismiss the entire jury venire, claiming defendants could not receive a fair trial after the prospective juror's unfinished statement. In denying the motion, the court found that the statement

22

did not poison or taint the entire jury panel. But the court ultimately dismissed the prospective juror for cause for conducting research in the matter, however.

On appeal, defendants argue the entire jury panel was tainted after the prospective juror's comment implied each of the defendants had prior juvenile records or arrests when in fact Sisneros, unlike Duran and Vasquez, did not. They argue the jurors eventually sworn to try the case would have mistakenly believed Sisneros had undisclosed priors like his codefendants, which likely would have affected their deliberations. The failure to dismiss the panel, they contend, thus denied them due process and a fair trial requiring reversal of their convictions.

"[T]rial court[s] possess[] broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*); *People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466-1467 [trial court's conclusion concerning jury bias and prejudice reviewed for abuse of discretion on appeal].) Dismissing an entire jury venire is a "drastic remedy" and is not appropriate as a matter of course merely because a prospective juror may have made some inflammatory remarks. (*Ibid.*) "[D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venire persons would be insufficient protection for the defendant." (*Ibid.*)

Several cases illustrate the relatively high showing of bias or prejudice necessary before dismissal of an entire jury panel is warranted. In *Medina*, at least five prospective jurors, who did not end up serving on the jury, made statements that other venire persons heard such as " 'in frontier justice style,' the authorities should 'bring the guilty S.O.B. in, we'll give him a trial, and then hang him[,]' " and " 'even his own lawyers think he's guilty.' " (*Medina, supra,* 51 Cal.3d at p. 888.) The Supreme Court found the trial court

23

did not err in refusing to dismiss the entire jury panel based on the inflammatory statements of those potential jurors. (*Id.* at p. 889.)

Similarly, in *People v. Vernon* (1979) 89 Cal.App.3d 853, 865 (*Vernon*), this court held that a defendant was not denied a fair trial nor was a mistrial necessary after a prospective juror stated during voir dire that the defendant had previously been tried for raping her niece. And in *People v. Nguyen* (1994) 23 Cal.App.4th 32, 40-41 (*Nguyen*), dismissal of the entire panel was unwarranted after a prospective juror of Vietnamese descent said he feared retaliation from the Vietnamese community if he served as a juror in the case because the defendant was also Vietnamese.

Like in *Medina*, *Vernon*, and *Nguyen*, defendants fall far short of satisfying the exacting standard for dismissing an entire jury panel. Based on the totality of the circumstances, we cannot say that the trial court abused its discretion in concluding that the prospective juror's single, incomplete comment that she "looked up" something about the defendants rises to the level of prejudice necessary to dismiss the jury venire in its entirety.

Notably, after Duran's counsel questioned the prospective juror on her jury questionnaire answers, Vasquez's counsel specifically asked whether anyone else had conducted outside research on the matter. Implicit in the panel members' response is that no one had conducted such research. Vasquez's counsel also asked whether "[e]verybody has basically an open mind? Is that yes?" The panel responded affirmatively.

Each person who did eventually serve on the jury thus affirmed his or her ability to be fair and impartial by keeping an open mind when considering the case. And the offending potential juror was dismissed and did not serve on defendants' jury.

Under these circumstances, the trial court was rightly satisfied that no injustice had resulted or would result from the lone, incomplete statement. No abuse of discretion occurred in refusing to dismiss the entire jury panel.

24

# V

## *Section 654*

Defendants contend that they robbed Fordyce and dissuaded Cushing from reporting the crime during a single course of conduct for which they may only be punished once under section 654.  The trial court, however, imposed separate sentences for both the count 2 robbery conviction and the count 5 dissuading a witness conviction. Finding the trial court properly sentenced defendants on both convictions, we reject defendants' section 654 challenge.

Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  The statute does not prohibit multiple convictions for the same conduct, only multiple punishments. (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.)  "In such a case, the proper procedure is to stay execution of sentence on one of the offenses."  (*Ibid.*)

In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent.  (*People v. Porter* (1987) 194 Cal.App.3d 34, 38 (*Porter*).)  "If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  (*Ibid.*)  "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it."  (*Ibid.*)

The record in this case supports the trial court's implicit finding that robbing Fordyce and dissuading Cushing from reporting the crime involved multiple objectives

25

even though they may have shared common acts or were otherwise parts of an indivisible course of conduct. The court reasonably could have inferred that defendants initially planned only to rob Fordyce while he sat alone in his car, but thereafter came up with a new idea: stopping Cushing from reporting the crime he had just witnessed to avoid detection or arrest. Similar conduct has been found separately punishable under section 654. (See *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1654, 1657 [sufficient evidence of two separate objectives--one for robbery and one for avoiding detection or dissuading a witness--existed where defendant kidnapped a victim and later told the victim that he knew where he lived and would kill him if he opened his mouth]; *People v. McGahuey* (1981) 121 Cal.App.3d 524, 529 [defendant properly convicted and sentenced for residential burglary and assault with a deadly weapon after throwing a hatchet at the victim to stop him from calling the police after the victim discovered defendant burglarizing his home].)

The decision in *Porter* is instructive. There, the victim was getting into his car when the appellant jumped into the vehicle while brandishing a knife. (*Porter, supra*, 194 Cal.App.3d at p. 36.) The appellant's accomplice got in and rifled through the victim's wallet. (*Ibid.*) After finding less than $10, the appellant ordered the victim to drive to a bank to withdraw additional money from an ATM machine, which was unsuccessful. (*Id.* at pp. 36-37.) The appellant was ultimately convicted of robbing the victim and kidnapping for the purpose of robbery. (*Ibid.*) The court upheld his punishments for both crimes, rejecting the appellant's argument that section 654 precluded double punishment since appellant had a single objective of robbing the victim. (*Id.* at pp. 37-38.) "What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant achieve a greater reward." (*Id.* at pp. 38-39.)

26

This is what occurred here. No longer satisfied with simply robbing Fordyce of his property, defendants decided to forcibly dissuade Cushing from calling law enforcement. All three raced through the parking lot in Duran's car directly at Cushing, and jumped out of the car. Vasquez threatened to shoot Cushing and Duran and Sisneros chased after him while he was on the phone with the 911 dispatcher. These actions were qualitatively different than taking Fordyce's property while he was seated in his car.

The trial court did not violate section 654 by imposing sentences on defendants for both their robbery and dissuading a witness by force convictions.

VI

*Evidence Code Section 352*

Defendants contend the trial court erred in failing to exclude evidence of Duran's juvenile robbery adjudication as more prejudicial than probative under Evidence Code section 352. Admitting the evidence, they argue, violated defendants' constitutional rights to due process by denying them a fundamentally fair trial.

Over defendants' objections, the trial court admitted evidence that Duran suffered a robbery adjudication in 2006 when he was a minor. Detective Sample testified, based on information he obtained from the investigating officers, that a rival gang member escaped from a home after being held for two days by a group of Norteno gang members, including Duran, who tied him up, beat him, and demanded his ATM card so that they could withdraw money from his account to bail another jailed Norteno gang member out of jail. Duran was arrested at the home where the rival gang member had been held; he was wearing red clothing. The house contained Norteno gang graffiti. At the time, he told officers he only hung with Nortenos gang members.

Although Detective Sample acknowledged that no gang allegations were included in the robbery adjudication, in his opinion, the juvenile adjudication evidence showed Duran was a Norteno gang member that engaged in gang activities.

27

Based on Detective Sample's testimony, defendants moved for a mistrial, arguing the evidence was highly inflammatory and exceeded the court's pre-set parameters for admitting such evidence. The court denied the motion, finding the evidence more probative than prejudicial under Evidence Code section 352.

Evidence Code section 352 allows a court "in its discretion, [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The prejudice referred to in section 352 is not the prejudice to a defendant that naturally flows from probative evidence tending to demonstrate guilt of a charged offense, but rather the prejudice resulting from " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Trial courts exercise discretion in determining the admissibility of evidence under Evidence Code section 352. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437, disapproved on other grounds in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn.14.) Reversal is warranted only when " ' "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at pp. 437-438.)

Duran first argues that the court never weighed the probative value of the juvenile adjudication evidence against the probability that it was unduly prejudicial under Evidence Code section 352. He also claims the court failed to conduct a similar analysis before it denied Duran's mistrial motion based on Detective Sample's description of the juvenile adjudication and its underlying factual basis. The court's purported failure to engage in these weighing processes, he contends, constitutes an abuse of discretion.

The record, however, belies defendants' contention. Prior to trial, Duran moved in limine to exclude the evidence under Evidence Code section 352. Duran specifically argued that "Cal[ifornia] Evidence Code [section] 352 requires the court to balance the relevance of any evidence with its potential for prejudice and undue consumption of time. Given the limited relevance of this material [Duran's juvenile adjudication], the fact that it will prejudice the jury and would have to be proven in a 'mini-trial' the court should exclude it under Evidence Code section 352."

Citing Evidence Code section 352, the court ruled the evidence was too prejudicial to be admitted for the purpose of establishing a predicate offense under the gang statute, but that it could be admitted as a basis of the gang expert's opinion that Duran was a Norteno gang member who engaged in gang activity. This shows the court was well aware of its duty to weigh the probative value of the evidence against its potential for undue prejudice before admitting it.

Before Detective Sample testified, Duran's counsel raised the juvenile adjudication issue again, seeking to clarify the parameters of the expert's testimony. The court explained that Detective Sample could testify to the robbery adjudication and the facts relating the offense to gang behavior. The court overruled several defense objections while Detective Sample was testifying about the matter, stating he would allow the testimony because it was "coming in for a limited purpose."

That the court did not expressly cite Evidence Code section 352 in overruling the trial objections is of no moment. It is well settled that court need not "expressly state for the record it engages in a weighing process every time it makes a ruling" as long as the record as a whole reflects the court was aware of and consistently performed such duty under section 352. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1053.) Here, the record as a whole demonstrates the court examined the evidence under section 352. The court was under no obligation to restate that it was reweighing the probative and prejudicial

29

value of the evidence when it subsequently considered and overruled defendants' objections during trial.

Having concluded that the court did weigh the evidence under Evidence Code section 352, we next consider whether the court abused its discretion in admitting the evidence for the limited purpose of expert opinion basis evidence. Duran contends the evidence was inflammatory and cumulative regarding an issue not reasonably subject to dispute--that he was a Norteno criminal street gang member. He further contends the evidence was of low probative value since the prior crime was not charged as a gang crime when committed. And, he argues the jury could have believed he was inadequately punished for the juvenile offense, thus making it more likely the jury convicted him to make up for the previous inadequate punishment. Sisneros raises similar contentions.

We find no abuse of discretion here. The evidence had substantial probative value regarding Duran's Norteno membership as well as his knowledge of the primary activities of Norteno gang members.

In prosecutions for active participation in a criminal street gang, like the one here, "the probative value of evidence of a defendant's gang-related separate offense generally is greater because it provides direct proof of several *ultimate facts* necessary to a conviction." (*People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).) Evidence that a defendant committed a gang-related offense on a separate occasion "provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity." (*Ibid.*) Evidence of a defendant's prior gang affiliation, moreover, can "help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*) [gang evidence relevant to fear, motive and intent]; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 178 [element of fear]; *People v. Williams* (1997) 16 Cal.4th 153, 193 [motive and identity].)

30

Here, Duran's juvenile adjudication and the facts underlying the adjudication tended to prove defendant's knowledge and active participation for purposes of the gang statutes. (§186.22, subd. (a) ["Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity . . ."].) At the time of the juvenile incident, Duran was arrested with several other Norteno gang members. He told investigators that he only hung out with Norteno gang members. He was arrested wearing red clothing associated with the Norteno street gang while in a residence containing Norteno gang graffiti. The investigation further revealed that the motive for the crime was to obtain money to bail out a fellow Norteno gang member who had recently been arrested. Such evidence was thus highly probative given the substantive offenses and the attached enhancements in this case.

We also conclude that the evidence was not particularly inflammatory compared with the charged offenses. The juvenile adjudication involved a robbery and assault, the same crimes charged in this case. In each case the victims were threatened with death.

Duran's juvenile adjudication involved a firearm and Vasquez threatened to shoot Lozano and Cushing for calling the police, intimating he had a gun in his waistband. Duran was carrying a knife when arrested. And, while both the charged crimes and Duran's juvenile adjudication involved weapons, no evidence showed the weapons were ever used against the victims. (*Tran, supra,* 51 Cal.4th at p. 1050 [evidence that shots were fired during defendant's prior extortion offense, which was offered to prove a predicate offense under the gang statute, was not unduly inflammatory where no evidence showed anyone was killed or injured or that defendant personally shot at or threatened anyone].)

*People v. Harris* (1998) 60 Cal.App.4th 727, 738 (*Harris*), provides useful guidance on when prior acts evidence is too inflammatory to be admissible. There, the defendant, a caregiver in a mental hospital, was charged with sexually assaulting two patients by licking and fondling them. (*Ibid.*) Both women were on speaking terms with

31

the defendant after the assaults. (*Ibid.*) The court admitted evidence that the defendant had been convicted of burglary with infliction of great bodily injury 23 years earlier. (*Id.* at pp. 738-739.) In describing the incident, the jury heard testimony of a viciously beaten and bloody victim who was a stranger to the defendant. (*Ibid.*)

This court found that the prior acts evidence was inflammatory in the extreme. (*Harris, supra,* 60 Cal.App.4th at p. 738.) The charged crimes, involving a breach of trust and the taking advantage of two emotionally and physically vulnerable women were of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury. (*Ibid.*)

Here, by contrast, Duran's juvenile robbery adjudication was not significantly different in nature or quality than the attacks on Fordyce and Lozano. And, unlike in *Harris*, where the prior offense was extremely remote--occurring 23 years before the charged offenses--the juvenile adjudication occurred only four years prior.

We also reject Duran's contention that the evidence likely swayed the jury to convict defendants because jurors believed Duran had somehow been *inadequately* punished for the juvenile offense. The fact that Duran had already had a juvenile petition sustained for his involvement in the robbery and had been punished for his conduct made the evidence less, rather than more, inflammatory. (*Hernandez, supra,* 33 Cal.4th at p. 1051 [gang evidence admitted to prove gang enhancement not inflammatory since it was not evidence of offenses for which a defendant might have escaped punishment]; *Tran, supra,* 51 Cal.4th at p. 1050 ["because defendant stood convicted of the [prior] extortion, there was little danger of confusing the issues by requiring the jury to determine if defendant was guilty of both the charged offenses and the extortion, and no risk the jury might convict defendant to prevent him from escaping punishment for the extortion"].)

Finally, the trial court instructed the jury that it could not consider evidence of gang activity for the purpose of concluding that defendant was a person of bad character

or someone that had a criminal disposition.  (*Tran, supra,* 51 Cal.4th at p. 1050 [citing similar limiting instruction as one reason for concluding that evidence of a defendant's prior gang-related conviction was not more prejudicial than probative under Evidence Code section 352].)  We presume the jury followed these instructions.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 25-26 (*Lindberg*).)

Evidence of Duran's past robbery adjudication had a tendency to prove he had knowledge of and engaged in one of the primary activities of the Norteno street gang--robbery.  (*Tran, supra,* 51 Cal.4th at p. 1048 [evidence defendant committed a gang-related offense on separate occasion provides direct evidence of a predicate offense, active gang participation, and knowledge of a pattern of criminal gang activity]; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323, as modified (Oct. 17, 2001) [evidence of past offenses has some tendency in reason to show a group's primary activity].)  It also tended to prove he was a Norteno gang member.  The trial court, therefore, properly exercised its discretion in admitting the evidence surrounding Duran's juvenile robbery adjudication.

Because no error occurred, we reject defendants' contention that the admission of this evidence violated defendants' constitutional rights to a fair trial.  (*Lindberg, supra,* 45 Cal.4th at p. 26 ["[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights"].)  This case is not like *People v. Albarran* (2007) 149 Cal.App.4th 214, 230-232 (*Albarran*), where the court found a federal constitutional violation because the gang evidence was highly prejudicial but only marginally relevant.  *Albarran* was "one of those rare and unusual occasions where the admission of evidence ha[d] violated federal due process and rendered the defendant's trial fundamentally unfair."  (*Albarran* at p. 232.)  That is not the case here where the challenged evidence was highly relevant to the substantive gang offense and the multiple gang enhancements.

## VII

### *Sixth Amendment Confrontation Clause*

Defendants also contend the court erred in allowing Detective Sample to testify to out-of-court statements about Duran's juvenile robbery adjudication because such evidence violated their rights to confront the witnesses against them under the Sixth Amendment to the United States Constitution.  Detective Sample based his testimony on discussions with the officers who investigated the juvenile adjudication case and its underlying circumstances.  It is this basis evidence, which was not independently admitted and which was derived from declarants who were not subjected to cross-examination, that defendants challenge on confrontation grounds.

Binding precedent requires us to find no confrontation clause violation.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*).)  But even if a violation occurred, we conclude it was harmless beyond a reasonable doubt.  (*People v. Lopez* (2012) 55 Cal.4th 569, 585 (*Lopez*) [beyond a reasonable doubt standard of error applies to violations of Sixth Amendment confrontation right].)

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford* ), the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  (*Id.* at pp. 53-54.)  *Crawford*, however, did not comprehensively define "testimonial."  (*Id.* at p. 68.)  Rather, the court declared that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" (*ibid.*), which, under the facts of the case, included recorded statements by a witness in

response to structured police questioning. (*People v. Cage* (2007) 40 Cal.4th 965, 978 [explaining *Crawford*].)

*Crawford* also made clear that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* 541 U.S. at p. 59, fn. 9 [citing *Tennessee v. Street* (1985) 471 U.S. 409, 413-414 [85 L.Ed.2d 425] [respondent's rights under the confrontation clause were not violated when an accomplice's out-of-court confession was introduced for the nonhearsay purpose of rebutting respondent's testimony that his own confession was coercively derived from the accomplice's statement].) Given the purpose of the basis evidence in this case, Detective Sample's testimony does not come within *Crawford's* protections.

Evidence Code section 801 limits expert testimony to an opinion that is "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ." (Evid. Code, § 801, subd. (b).) An expert may base his opinion on material that is not admitted into evidence if the material is of a type that is reasonably relied upon by experts in the particular field in forming their opinions and so long as the material is reliable. (*Gardeley, supra,* 14 Cal.4th at p. 618.) In forming their opinions about gangs, experts routinely rely on information obtained by talking to gang members as well as from information contained in investigative reports prepared by other officers. (See e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 948-949 (*Gonzalez*) [gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, including interviews with gang members, which in sum is reliable]; *People v. Gamez* (1991) 235 Cal.App.3d 957, 966 (*Gamez*) [police officers testifying as gang experts properly based their testimony on "personal observations of and discussions with gang members as well as information from other

officers and the department's files"], disapproved on other grounds in *Gardeley, supra,* 14 Cal.4th at p. 624, fn.10.)

In *Gardeley*, our Supreme Court said that hearsay statements testified to by a gang expert as a basis for his or her expert opinion are not offered for their truth but instead are offered merely to evaluate the expert's opinion. (*Gardeley, supra,* 14 Cal.4th at pp. 618-619.) Thus, even if testimonial, admitting the statements would not violate the confrontation clause. That decision binds us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*) ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction"]; see also *People v. Hill* (2011) 191 Cal.App.4th 1104, 1131 (*Hill II*) ["we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority"].)

Under *Gardeley*, the trial court properly concluded that the challenged basis evidence related by Detective Sample concerning Duran's juvenile robbery adjudication was not offered for its truth but only to evaluate Detective Sample's opinion. Its admission thus did not violate the hearsay rule or the confrontation clause.

While bound by *Gardeley*, we recognize that some courts have questioned the premise that out-of-court statements upon which an expert's opinion is based are not offered for their truth. (See e.g., *Hill II, supra,* 191 Cal.App.4th at pp. 1129-1130.) In *Hill II*, for example, the court observed that *Gardeley* was based on an "implied assumption that the out-of-court statements *may help the jury evaluate the expert's opinion without regard to the truth of the statements*. Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical." (*Ibid.*; italics added.) The court noted, however, that that "assumption appears to be incorrect." (*Ibid.*) In the court's view, the only way the jury could properly evaluate the expert's opinion was to assume the truth or falsity of the out-of-court statement. (*Id.* at p. 1131 ["where basis evidence consists of an out-of-court

36

statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion"].)

Recently, two divisions in the Fourth District came to opposite conclusions on the issue. The Supreme Court has granted review in both cases. (See *People v. Sanchez*, Supreme Court (review granted May 14, 2014, S216681) [admission of nontestifying police officers' statements that defendant admitted to gang association did not violate confrontation clause]; and *People v. Archuleta*, Supreme Court (review granted June 11, 2014, S218640) [fellow gang member's statement that defendant had directed a robbery was offered for its truth and was testimonial for confrontation clause purposes, but admission was harmless beyond a reasonable doubt].) Until the Supreme Court decides otherwise, *Gardeley* compels us to conclude that no confrontation clause violation occurred because the out-of-court statements concerning Duran's juvenile adjudication upon which Detective Sample based his opinion were not offered for their truth, but rather to aid the jury in evaluating the validity of Detective Sample's expert opinion. (*Auto Equity Sales, supra,* 57 Cal.2d at p. 455.)

Citing *Williams v. Illinois* (2012) [183 L.Ed.2d 89] (*Williams*), defendants argue that the *Gardeley* rule that expert opinion basis evidence is not offered for its truth is no longer valid. Based on statements in the dissent and concurrence in *Williams*, defendants claim a majority of the United States Supreme Court has now found that expert opinion basis evidence is offered for its truth and thus subject to confrontation clause scrutiny. Although the *Williams* plurality concluded expert basis testimony does not violate *Crawford* because it is not admitted for its truth (*Williams, supra,* 183 L.Ed.2d 98-99, 106, plur. opn.), both Justice Thomas's concurrence and the four *Williams* dissenters rejected that analysis, concluding this kind of evidence is admitted for its truth. (*Id.* at pp.129-130, conc. opn. of Thomas, J.; pp. 142-147, dis. opn. of Kagan, J.)

The People, on the other hand, argue that the dissent in *Williams* holds no precedential value and is not binding. (*Lopez, supra,* 55 Cal.4th at p. 585 ["dissenting

opinions are not binding precedent"].)  They allege the dissent's view cannot be combined with Justice Thomas's concurrence to cobble together precedent because doing so would be contrary to the result and judgment in the case, which found no confrontation clause violation.  (See *Rappa v. New Castle County* (3d Cir. 1994) 18 F.3d 1043, 1060, fn. 25 [finding that a view taken by a majority of concurring and dissenting Justices could not have precedential value, "as the precedential meaning would then be inconsistent with the result in that case"]; see also *Lopez, supra,* 55 Cal.4th at p. 590, dis. opn. of Liu, J. ["The United States Supreme Court's most recent decision in this area [*Williams*] produced no authoritative guidance beyond the result reached on the particular facts of that case"].)

We need not decide whether the rule announced in *Gardeley* has been implicitly overruled, however.  Even if we assume without deciding that evidence of Duran's robbery adjudication constituted "testimonial" evidence effectively offered for its truth in violation of the confrontation clause, admitting the evidence through Detective Sample as one of several bases for his opinions was harmless.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)  We are convinced beyond a reasonable doubt that the jury would have concluded that defendants were active Norteno gang members and that the offenses were gang-related even without Detective Sample's testimony regarding Duran's juvenile adjudication.  (*Lopez, supra,* 55 Cal.4th at p. 585.)

Multiple witnesses testified at trial that defendants repeatedly called out "Norte" or "Nortenos" while attacking Fordyce and Lozano and while intimidating Cushing from calling the police.  Some of these witnesses were familiar with the words, either from prior gang training they received or from growing up in a gang-infiltrated neighborhood, and understood the terms to be gang-related.

A red belt consistent with Norteno gang attire was found in Duran's car when defendants were pulled over.  Defendants were with two other Norteno gang members when they were arrested.  Sisneros admitted to a police investigator that he "hood bangs"

38

with Northerners and characterized himself as a "Northerner from the heights." Duran yelled out "Norte" while being interviewed by police, in an apparent attempt to communicate with one of his cohorts being questioned in an adjoining room. Vasquez admitted he had a Norteno gang tattoo on his chest. Vasquez had also been contacted numerous times wearing Norteno gang clothing, and posed in pictures with other Norteno gang members while throwing Norteno gang signs. Both Duran and Vasquez were involved in Norteno gang-related incidents in jail while awaiting trial on the current charges--Vasquez passed a kite with Norteno curriculum and gang structure information to another inmate and Duran, together with other jailed Norteno gang members, assaulted a Norteno gang member who wished to disassociate from the gang.

This evidence was more than sufficient to establish defendants' Norteno gang ties and that the crimes were gang-related even if one disregards Detective Sample's testimony about Duran's juvenile adjudication. Thus, even if the court erred in admitting the testimony the error was not prejudicial.

## VIII

### *Hypothetical Questions Regarding Specific Intent*

Defendants contend the trial court erred in permitting Detective Sample to opine about the specific intent of hypothetical gang members who committed crimes similar to the charged offenses to prove the gang enhancement under section 186.22, subdivision (b). In defendants' view, Detective Sample did nothing more than opine on *their* specific intent under the guise of the hypothetical. They argue hypothetical questions may not be used to conceal an expert's improper testimony on the real defendants' subjective knowledge and intent. We disagree. But even if an error occurred, we find it harmless on this record.

A person with special knowledge, skill, experience, training, or education in a particular field may testify as an expert witness and give an opinion if the subject matter

39

is sufficiently beyond common experience so that the opinion would assist the trier of fact. (Evid. Code, §§ 720, 801.) While an expert's opinion may embrace the ultimate issue to be decided, it may not encompass matters of common knowledge that jurors could decide as intelligently as the witness. (Evid. Code, § 805.) It is well settled that "[t]he subject matter of the culture and habits of criminal street gangs" is sufficiently beyond common knowledge that expert testimony on such matters is appropriate. (*Gardeley*, *supra*, 14 Cal.4th at p. 617.)

A trial court generally has "broad discretion in deciding whether to admit or exclude expert testimony . . . ." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "[I]ts decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*Ibid.*)

An expert "may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' " (*Gardeley, supra,* 14 Cal.4th at p. 618.) "Such a hypothetical question must be rooted in facts shown by the evidence, however." (*Ibid.*)

The Supreme Court addressed the use of hypotheticals in the context of expert gang testimony in *People v. Vang* (2011) 52 Cal.4th 1038, 1044-1045 (*Vang*). There, the Supreme Court reversed the Court of Appeal's decision that found the trial court erroneously permitted the expert to testify that a crime was gang related based on hypotheticals that closely tracked the evidence presented in the case. (*Vang* at p. 1044.)

The Court of Appeal had primarily relied on *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647 (*Killebrew*), which involved a gang expert who testified through hypothetical questions about "the subjective *knowledge and intent*" of each of 11 occupants in three vehicles. (*Killebrew* at p. 658.) The *Killebrew* court held it was error to admit the expert's testimony because issues of subjective knowledge and intent were properly reserved for the trier of fact. (*Ibid.*) Because the expert's testimony was the only evidence offered to establish the elements of the defendant's alleged conspiracy to

40

possess a handgun, no substantial evidence supported the conviction. (*Id.* at pp. 660-661.)

*Vang* criticized *Killibrew's* analysis, pointing out *Killibrew's* limited significance because it "overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves." (*Vang, supra,* 52 Cal.4th at p. 1049.) According to the court, " '[a] lthough [*Killibrew's*] legal discussion states that the expert "informed the jury of his belief of the suspects' knowledge and intent on the night in question," its factual account states that "[t]hrough the use of hypothetical questions, Darbee [the expert] testified that each of the individuals in the three cars" had certain knowledge and intent.' " (*Id.* at p. 1047.)

While the Supreme Court assumed for purposes of its opinion that an expert testifying about specific defendants was improper, it nonetheless confirmed that an expert testifying about hypothetical persons was permissible and that such testimony did not give an opinion on how the jury should decide a case. (*Vang, supra*, 52 Cal.4th at pp. 1047-1048, fn. 4.) Thus, contrary to the Court of Appeal, the high court held that the trial court had properly permitted the expert to testify that a hypothetical assault that tracked the evidence was a " 'gang-motivated' " attack. (*Id.* at p. 1043.)

Like in *Vang*, the expert here testified about hypothetical gang members and hypothetical crimes that tracked the evidence presented in the case. Detective Sample did not testify about the defendants specifically. Thus, he did not offer an opinion on *their* specific intent as defendants argue.

Defendants' contention that *Vang* did not consider whether an expert could testify regarding a hypothetical defendant's specific intent, moreover, appears to conflict with the Supreme Court's actual decision. The Supreme Court expressly acknowledged the Court of Appeal's reasoning that " 'the prosecution may not use a hypothetical question to conceal an expert's improper testimony on the real defendants' subjective knowledge

41

and intent' " when it found the trial court had abused its discretion. (*Vang, supra,* 52 Cal.4th at p. 1044.) Yet, the Supreme Court found the Court of Appeal's decision unpersuasive because, again, it did not distinguish between hypothetical persons and actual defendants. (*Id.* at p. 1047; see also *Hill II*, *supra*, 191 Cal.App.4th at p. 1126 [where a gang expert was properly allowed to testify as to what gang members think and how they behave, specifically, that a gang member would not go into rival gang territory except to shoot or kill a rival gang member, and if the intended target is not there anyone else will do, and killing a police officer sends the ultimate message of gang reputation]; and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384 [approved expert testimony focused on what gangs and gang members typically expect and not on the defendant's subjective expectation].)

Thus, it appears the Supreme Court did consider the issue presented here, namely, whether an expert may testify about the knowledge and specific intent of a hypothetical person. Other cases have implicitly recognized the same. For example, in *People v. Rios* (2013) 222 Cal.App.4th 542 (*Rios*), the court summarized *Vang* as follows: "At trial, the prosecution's gang expert responded to two hypothetical questions that closely tracked the evidence in the case . . . [and was asked] (1) whether the assault was committed for the benefit of, at the direction of, or in association with the gang and (2) whether the attack was ' "gang motivated" ' (*an apparent shorthand reference to the 'specific intent to promote, further, or assist in any criminal conduct by gang members'* (§ 186.22(b)(1))." (*Rios* at p. 570, italics added.)

But even if *Vang* cannot be read as having considered that precise issue, and assuming defendants are correct that an expert may not testify regarding a hypothetical person's specific intent, we nevertheless find that any abuse of discretion in allowing Detective Sample to opine on the specific intent of three hypothetical gang members in this case was harmless. Erroneously admitting expert testimony requires reversal only if it is reasonably probable the verdict would have been more favorable to the defendant in

the absence of the error.  (*People v. Prieto*, *supra*, 30 Cal.4th at p. 247; *People v. Watson* (1956) 46 Cal.2d 818, 836].)  Given the record, we conclude it was not reasonably probable the jury would have found the gang enhancements not true had the court precluded Detective Sample from answering the hypothetical question about the specific intent of hypothetical gang members.

Even without Detective Sample's challenged testimony, there was ample evidence from which the jury could infer defendants' specific intent for purposes of the gang enhancement.  " 'To establish a gang enhancement allegation, "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " [Citation.]' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411 (*Miranda*).)  "There is rarely direct evidence that a crime was committed for the benefit of a gang.  For this reason, 'we routinely draw inferences about intent from the predictable results of action. . . . We can discover mental state only from how people act and what they say.' " (*Id.* at pp. 411-412.)

" 'Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.' " (*Miranda, supra,* 192 Cal.App.4th at p. 412.)  In *People v. Morales* (2003) 112 Cal.App.4th 1176, 1179 (*Morales*), for example, the court found that "evidence that [the] defendant knowingly committed the charged crimes in association with two fellow gang members was sufficient to support the jury's findings on the gang enhancements that (a) the crimes were 'committed for the benefit of, at the direction of, or in association with' a gang, and (b) [the] defendant committed the crimes 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Morales* at pp. 1179, 1198 ["very

43

fact that defendant committed the charged crimes in association with fellow gang members" supports the gang enhancement].)

Here, Detective Sample opined that all three defendants were active Norteno gang members at the time of the offenses. The other two men with whom defendants were arrested were also Norteno gang members. Both Vasquez and his brother Luis Vasquez had gang tattoos. Defendants also repeatedly called out "Norte" during the attacks. Gang attire was also found in the car when they were apprehended. From this evidence, the jury reasonably could have inferred that defendants knew the others were gang members and that they all intended to rob and assault Fordyce, assault Lozano, and dissuade Cushing from reporting the crimes, and that they all intended to promote or assist one another in carrying out those crimes. This evidence was sufficient to establish the specific intent of each defendant under section 186.22, subdivision (b)(1). (*Morales, supra,* 112 Cal.App.4th at p. 1198.)

Any purported error in allowing Detective Sample to opine on the specific intent of hypothetical persons was thus harmless. The outcome would have been the same even in the absence of such testimony.

IX

*Admissibility of Defendants' Booking Statements About Gang Membership*

Police gave standard *Miranda* warnings to each defendant before individually interrogating them. (*Miranda, supra,* 384 U.S. 436.) Despite these *Miranda* warnings, defendants now contend the court violated their Fifth Amendment privilege against self-incrimination by admitting several statements they made to jail classification officers while being booked into jail following police questioning. Duran admitted he was affiliated with a gang and listed "Northerner" on the questionnaire form. Sisneros and Vasquez both denied being gang members, but indicated that they "[hung] with

44

Northerners" on their classification forms. We conclude that even if the court erred in admitting defendants' responses to the jail booking questions, the error was harmless.

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra,* 384 U.S. at p. 444.) An individual is subjected to "custodial interrogation" whenever law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. (*Ibid.*) The Supreme Court later clarified that the definition included not only express questioning by law enforcement but also its "functional equivalent." (*Arizona v. Mauro* (1987) 481 U.S. 520, 526 [95 L.Ed.2d 458].)

In *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297], the Supreme Court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Fns. omitted.) Later, in *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601 [110 L.Ed.2d 528], the Supreme Court recognized a " 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' " In that case, the court found the exception applied to questions asked regarding a defendant's name, address, height, weight, eye color, date of birth, and current age. (*Ibid.*)

Our Supreme Court recently held that asking an individual about his gang affiliation for jail administrative purposes, particularly for the safety of custodial staff and inmates, does not come within the purview of the booking exception to *Miranda*. (*People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*).) Such questions exceed the scope of the exception because the questions are reasonably likely to elicit an incriminating response given California's criminal gang statutes and a defendant's

pending charges. While officers are permitted to ask these questions for institutional security purposes, a defendant's un-Mirandized responses are inadmissible against him during the People's case-in-chief. (*Ibid.*) Thus, under *Elizalde*, defendants' responses to the jail booking questions regarding their gang affiliations were not admissible unless they were given proper *Miranda* warnings which they knowingly waived.

According to the People, Duran and Sisneros' responses to the jail booking questions were admissible because they were Mirandized prior to being interrogated by police and they each waived their *Miranda* rights before speaking with investigators. The People do not specifically address whether the same reasoning applies to Vasquez's responses to the jail classification questions. The trial court had previously ruled that Vasquez's taped police interview was inadmissible because he had invoked his right to counsel prior to being questioned.

Defendants, on the other hand, contend the initial *Miranda* warnings did not extend to the later jail booking questions and answers. In other words, police were required to readvise them of their *Miranda* rights before asking them the jail classification questions regarding gang affiliation.

Any subsequent interrogation that is reasonably contemporaneous with a knowing and intelligent waiver of a suspect's *Miranda* rights does not require readvisement of those constitutional rights. (*People v. Williams* (2010) 49 Cal.4th 405, 434-435, as modified (Aug. 18, 2010).) "The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and '[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights.' " (*Ibid.*; *People v. Mickle* (1991) 54 Cal.3d 140, 171 [an interrogation conducted 36 hours after the first interview was reasonably contemporaneous].)

While the parties dispute whether readvisement was necessary, we need not resolve the issue here. Even assuming the court erred in admitting defendants' responses to the jail classification questions, we find the error harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d 705].) The record contains convincing evidence of defendants' Norteno gang affiliation without any jail classification admissions. (See *Elizalde, supra,* 61 Cal.4th at p. 542 [erroneous admission of responses to jail booking questions harmless beyond a reasonable doubt where the defendant's gang membership was convincingly established by three witnesses who testified that they knew him to be a gang member and the gang expert opined that defendant was a gang member].)

Here, Detective Sample opined that all three defendants were active Norteno gang members when they committed the charged, gang-related offenses. Defendants repeatedly yelled the word "Norte" or "Nortenos" during the attacks. Following the assaults on Fordyce and Lozano, defendants were arrested with two other individuals who were Nortenos. A red canvas belt, often worn by Norteno gang members, was found in Duran's car during a search of the vehicle.

Police had contacted Sisneros several times with Norteno gang members while he was wearing red clothing. When being interviewed by police in this case, Sisneros admitted he "hood bangs" with Northerners, characterized himself as a "Northerner from the heights," and admitted that his family members had always been Northerners. Thus, Sisneros' later admission to jail classification officers that he "hangs with Northerners" was merely cumulative of other properly admitted evidence.

While awaiting trial in this case, Duran and several Norteno gang members assaulted another Norteno member who wanted to drop out of the gang. Duran also yelled out the word "Norte" while be interrogated by police for the instant crimes.

Vasquez had a Norteno gang tattoo on his chest, had been shot three months earlier at a gang party, had been contacted on multiple occasions associating with

Norteno gang members, often wore red clothing indicative of the Nortenos, was photographed with other Norteno gang members throwing gang signs at a funeral for a documented Norteno gang member, and was suspected of passing a kite in jail containing Norteno curriculum or training materials while awaiting trial in this case.

In light of this evidence establishing defendants' Norteno gang ties, admitting defendants' statements to the booking officers that they hung with or were affiliated with "Northerners" was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24; *Elizalde, supra,* 61 Cal.4th at p. 542 ["Because [defendant's] gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of his challenged statements was harmless beyond a reasonable doubt"].) Given the absence of any prejudice from the statements' admission, we reject defendants' *Miranda* challenge.

## X

### *Evidence of a Criminal Street Gang*

Defendants were convicted of violating section 186.22, subdivision (a), the substantive gang crime of actively participating in a criminal street gang, and of several gang enhancements under section 186.22, subdivision (b). Following our request for supplemental briefing, they now claim insufficient evidence established the existence of a "criminal street gang" for purposes of the gang offense and the gang enhancements.

The substantive gang offense under section 186.22, subdivision (a) provides, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished [as specified]." (§ 186.22, subd. (a).) The gang enhancement imposes additional punishment for felony convictions "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the

48

specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subd. (b).)

"The existence of a criminal street gang is unquestionably an element of both the enhancement and the substantive offense."  (*In re Jose P.* (2003) 106 Cal.App.4th 458, 466 (*In re Jose*), disapproved on other grounds in *Prunty*, *supra*, 62 Cal.4th at p. 78, fn.5.)  Section 186.22, subdivision (f) defines "criminal street gang" as "any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses."  (*Prunty* at p. 67; see also § 186.22, subd. (f).)

While defendants' appeals were pending, the Supreme Court decided *Prunty*, which construed the definition of a "criminal street gang" under section 186.22, subdivision (f).  (*Prunty, supra,* 62 Cal.4th at pp. 70-71.)  *Prunty* also discussed the proof necessary to establish the existence of such a gang when the prosecution's theory turns on the conduct of one or more gang subsets.  (*Prunty* at p. 67.)  The analysis applies to both the substantive gang offense and the gang enhancements.  (*Id.* at p. 72, fn.3.)  We thus examine the effect of *Prunty* on defendants' appeals.

The defendant in *Prunty* identified as Norteno and specifically claimed the Detroit Boulevard set of the Nortenos as his own.  (*Prunty, supra,* 62 Cal.4th at pp. 67-68.)  He had shot at a perceived rival gang member at a Sacramento shopping center while uttering gang slurs and yelling the word "Norte."  (*Ibid.*)  The prosecution sought to prove he committed the charged crimes to benefit the Sacramento-area Norteno street gang.  (*Id.* at p. 67.)

To establish the gang enhancement, the prosecution's gang expert testified about the Sacramento-area Norteno gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of

49

two local neighborhood subsets, the Varrio Gardenland Nortenos and the Varrio Centro Nortenos. (*Prunty, supra,* 62 Cal.4th at pp. 67, 69.) The gang expert, however, did not provide any specific testimony connecting the subsets' activities to one another or to the Sacramento Norteno gang in general. (*Id.* at p. 67.)

In reversing the gang enhancement for insufficient evidence, the Supreme Court found the prosecution failed to show a connection among the subsets it alleged comprised the criminal street gang. (*Prunty, supra,* 62 Cal.4th at p. 68; § 186.22, subd. (b).) "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty* at p. 71.)

The court explained that the necessary "connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." (*Prunty, supra,* 62 Cal.4th at p. 71.) Evidence that "various subset members exhibit behavior showing their self-identification with a larger group" may also be sufficient to allow those subsets to be treated as a single organization. (*Ibid.*) However the "prosecution chooses to demonstrate that a relationship exists" (*id.* at p.72), the evidence must show that "the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f), [are] one and the same." (*Id.* at pp. 75-76.)

*Prunty* provided several examples demonstrating how to establish the necessary connection between various subsets and an alleged larger gang for purposes of the gang enhancement. (*Prunty, supra,* 62 Cal.4th at p. 77.) For more formal groups, evidence showing shared bylaws or organizational arrangements, shot callers who answer to a

50

higher authority, or that the subsets routinely protect the same turf may prove the connection. (*Ibid.*)

In situations where a group's structure is more informal, evidence showing various subsets collaborate to accomplish shared goals, strategize to carry out activities, or profess or exhibit loyalty to one another would be sufficient to imply the existence of a genuinely shared venture. (*Prunty, supra,* 62 Cal.4th at pp. 78-79.) Evidence that gang subsets acknowledge one another as part of the same organization, coupled with evidence that the organization tends to operate in decentralized fashion in a relevant geographic area may also be sufficient. (*Id.* at p. 79.)

Applying this framework to the evidence presented in *Prunty*, the Supreme Court first found that the prosecution sufficiently proved that the Sacramento-area Nortenos engaged in illicit primary activities since Defective Sample had testified that " 'the Nortenos' in the area engage in various criminal practices, including homicide, assault, and firearms offenses." (*Prunty, supra,* 62 Cal.4th at p. 82.) We note that Detective Sample provided similar testimony here.

What the Supreme Court found lacking, however, was evidence regarding the necessary predicate offenses. (*Prunty, supra,* 62 Cal.4th at p. 82.) While the gang expert in *Prunty* referred to two offenses involving three alleged Norteno subsets, which he characterized as Nortenos, "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteno criminal street gang." (*Ibid.*)

We find the evidence regarding predicate offenses in this case decidedly different than the evidence--or lack of evidence--proffered in *Prunty*. Expert gang testimony, coupled with other trial evidence, provided the required connection the Supreme Court found absent in *Prunty*.

The People's theory below was that the "criminal street gang" defendants sought to participate in and benefit was the larger Sacramento-area Norteno criminal street gang,

51

which consisted of several local neighborhood subsets--the same theory set forth in *Prunty*. To prove the existence of this larger criminal street gang, the prosecution proffered predicate crimes committed by certain subset members. Defendants contend insufficient evidence links defendants and the subsets to this larger "criminal street gang." We disagree.

Officer Herrera, a gang investigator for the West Sacramento Police Department testified to two predicate offenses--referred to as the Memorial Park predicates--committed by a West Sacramento subset of the Norteno street gang known as the Broderick Boys. Officer Herrera linked the West Sacramento subset to the defendants and the larger Sacramento-area criminal street gang through photographic evidence.

Given their "RVN" tattoos, the evidence showed that Vasquez and his brother Luis Vasquez claimed the Richardson Village Nortenos set from the Del Paso Heights area. Pictures posted on a Richardson Village Norteno MySpace page as well as Vasquez's personal MySpace page showed West Sacramento Norteno gang members, including Norteno gang members affiliated with the Broderick Boys.

Vasquez and other West Sacramento Norteno gang members are seen in several pictures throwing Norteno gang signs and wearing red attire. Ryan Boyd (also known as Ryan White or Derek White), who was arrested with defendants, is also pictured. Several of the pictures were taken at the funeral of Frank White, a well-documented Norteno gang member. Sisneros admitted knowing Frank White when he was arrested.

From this evidence, a jury reasonably could have concluded that Norteno subsets in West Sacramento associate with other Norteno subsets including the Richardson Village Norteno subset in Del Paso Heights. Members of both sets attended the funeral of a "well-documented" Norteno gang member. Such conduct shows a loyalty not only to their particular set but also an association with the larger Norteno street gang as a whole. (*Prunty, supra,* 62 Cal.4th at p. 78 ["evidence that two Norteno subsets have

52

professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate"].)

The funeral pictures, we believe, also prove that "members of two gang subsets 'hang out together' and 'back up each other,' " thus demonstrating that "the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture." (*Prunty, supra,* 62 Cal.4th at p. 78.) As Officer Herrera testified, part of the Sacramento-area Norteno criminal street gang's activities include "all get[ting] together for functions" such as "funerals."

Based on his experience as an expert in Hispanic criminal street gangs, Officer Herrera also testified that different Norteno sets comingle, hang out with each other, and often commit crimes together. Officer Herrera responded "yes" when asked whether it was "fair to say that Nortenos of any set, whether it be Del Paso Heights or Broderick Boys . . . follow the same ideology," and "use the same signs and symbols," including the number 14.

Detective Sample similarly testified that the violent acts of one Norteno subset help or benefit other sets under the rubric of the larger Norteno criminal street gang. When one set commits a violent crime, other members associated with the same umbrella gang receive the same fear and respect from the crime.

The evidence showed that the crimes were committed in West Sacramento, and that the defendants called out "Norte" or "Nortenos" during the attacks rather than any particular Norteno subset. Evidence also established that Sisernos used to live in West Sacramento, and now self-identified as a "Northerner from the heights." Such evidence tends to show that Norteno gang members can move fluidly among various gang territories, and that a gang member claiming one subset or area, such as Vasquez identifying himself as a Richardson Village Norteno through his tattoo and Sisneros characterizing himself as a "Northerner from the heights," may commit crimes in the

territory of other Norteno subsets. The jury, moreover, reasonably could have concluded that by calling out "Norte" during the vicious attacks on the nongang member victims in this case, the umbrella Norteno organization benefitted as the victims and other people in the community were more likely to attribute the attack with the Norteno criminal street gang in general.

Finally, Detective Sample testified that even though Norteno gang members may belong to different sets or subsets, their "foremost allegiance is to the Nortenos gang, aside from their set or subset." They demonstrate such allegiance through their shared use of the same colors, the same monikers, the same letters, and the same identifying symbols linking them to the larger Norteno gang.

This evidence sufficiently shows the behavior and practices of both West Sacramento Nortenos, including the Broderick Boys, and Del Paso Heights Nortenos such as the Richardson Village Nortenos, which could reasonably lead the jury to conclude the subsets shared an association with each other and the larger Sacramento-area Norteno criminal street gang. This stands in stark contrast to the evidence in *Prunty*, where the gang expert simply "described the subsets by name, characterized them as Nortenos, and testified as to the alleged predicate offenses." (*Prunty, supra,* 62 Cal.4th at p. 83.)

Our conclusion is further buttressed after reviewing the evidence presented in two cases discussed in *Prunty*, *People v. Ortega* (2006) 145 Cal.App.4th 1344 (*Ortega*) and *In re Jose P.*, *supra*, 106 Cal.App.4th 458. (*Prunty, supra,* 62 Cal.4th at p. 78, fn.5.) While the Supreme Court disapproved of the cases to the extent they did not require proof of an organizational or associational connection to show the existence of a single criminal street gang, the court nevertheless conceded that the evidence in both cases was likely sufficient to show the necessary connection under *Prunty's* framework. (*Ibid.*)

The gang expert in *Ortega* testified that there were thousands of Norteno gang members in the Sacramento area that operated through subsets. (*Ortega, supra,*

54

145 Cal.App.4th at p. 1356.)  In finding "[t]here was sufficient evidence that Norteno was a criminal street gang," the court noted that "[n]o evidence indicated the goals and activities of a particular subset were not shared by the others." (*Id.* at p. 1357.)  And, there was further testimony "that it was not uncommon for members of different gangs to work in concert to commit a crime." (*Ibid.*)  As discussed above, both Officer Herrera and Detective Sample provided similar testimony in this case.

The gang expert in *In re Jose* testified that the " 'Norteno' street gang" was an ongoing organization having around 600 members or associates in Salinas, which was separated into cliques or factions. (*In re Jose, supra,* 106 Cal.App.4th at p. 463.)  According to the expert, two such subgroups, the Santa Rita and Salinas East Market Street (SEM) gangs, were loyal to one another and to the larger Norteno street gang. (*Ibid.*)  Similarly, expert testimony in this case showed that regardless of whether an individual was a West Sacramento Broderick Boys Norteno or a Richardson Village Norteno from Del Paso Heights, his first allegiance was to the Sacramento-area Norteno criminal street gang, and that both sets follow the same ideology and show their allegiance to the Norteno street gang by using the same signs and symbols.

The third predicate offense in this case, testified to by Detective Sample, also did not run afoul of *Prunty*.  It involved a murder committed by Steven Duran (no evidence showed any relation to defendant Duran).  He was validated as a Norteno gang member based on the crime, but was not affiliated with any particular Norteno set.  The evidence thus showed Steven Duran identified with the larger Norteno criminal street gang alleged by the prosecution rather than a specific Norteno subset.

As the Supreme Court emphasized in *Prunty*, "[t]he key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group.' " (*Id.* 62 Cal.4th at p. 80.)  We find the prosecution satisfied that burden here.

XI

*Evidence of Active Gang Participation*

Defendants finally contend insufficient evidence shows they "actively participat[ed]" in the alleged criminal street gang under section 186.22, subdivision (a). Defendants fail to sustain the heavy burden of establishing such an insufficient evidence claim, however. The record, we believe, contains ample evidence that defendants actively participated in the Norteno criminal street gang when they committed the charged offenses.

The level of participation required to establish the element of "active participation in a criminal street gang" under section 186.22, subdivision (a), is "participation that is more than nominal or passive." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) "A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22(a). (§ 186.22, subd. (i).)" (*Rodriguez* at p. 1130.)

Sisneros argues that although he lived in a neighborhood with gang members, and had family members who were Northerners, he did not consider himself a gang member. The absence of any gang tattoos or previous gang convictions, he contends, further shows he was not actively participating in the Norteno street gang when he assaulted Fordyce and Lozano. These facts, he contends, distinguish this case from *People v. Castenada* (2000) 23 Cal.4th 743, 745, 752 (*Castenada*) and *In re Jose, supra,* 106 Cal.App.4th at p. 466, which both found sufficient evidence of active gang participation where, among other things, the respective defendants had been found in the company of gang members on at least seven prior occasions, and had admitted or bragged about associating with the gang.

A defendant's active gang membership is often a matter beyond the common knowledge of jurors, making it the proper subject of expert testimony. (*Gamez, supra,* 235 Cal.App.3d at p. 965; see also *People v. Valdez* (1997) 58 Cal.App.4th 494, 506

(*Valdez*) [expert properly opined on defendant's membership in gangs]; *People v. Champion* (1995) 9 Cal.4th 879 [expert testimony that defendants were members of a particular gang].) Here, Detective Sample opined that Sisneros was an active Norteno gang member.

He based his opinion on several factors, including that Sisneros committed the charged crimes, which he characterized as gang-related, in the presence of several other Norteno gang members. (*Vang, supra,* 52 Cal.4th at pp. 1044-1045 [expert properly testified through hypotheticals that crimes were gang-motivated].) Sisneros had also been contacted multiple times with Norteno gang members, was documented wearing red gang-related clothing on several occasions, had admitted to officers that he "hood bangs" with Northerners, identified himself as a "Northerner from the heights," and admitted that his family members had always been Northerners.

These facts are similar to those found sufficient to sustain an active gang participation finding in *Castenada* and *In re Jose.* (*Castenada, supra,* 23 Cal.4th at p.753 ["evidence of the crimes defendant here committed, his many contacts on previous occasions with the Goldenwest criminal street gang, and his admissions by bragging to police officers on those occasions of gang association or membership" proved the defendant's active participation]; *In re Jose, supra,* 106 Cal.App.4th at pp. 467-468 [the minor admitted associating with criminal street gangs; had been contacted by the police on several occasions in the company of known gang members; wore gang colors; had been involved in crimes for the benefit of the gang; and told the police he would do what gang members asked of him].) In other words, the evidence sufficiently shows that Sisneros was more than nominally involved with the Norteno street gang. (*Castenada, supra,* 23 Cal.4th at p. 745 ["To prove that a defendant 'actively participates' in a gang . . . the evidence [must establish] that the defendant's involvement with the gang is more than nominal or passive"].)

The absence of gang tattoos, moreover, is not dispositive of the active participation issue. In *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509, for example, a defendant who had no gang-related tattoos, was not seen wearing gang clothing or flashing gang hand signs, and whose name had not come up as an active gang member in the expert's recent extensive interviews with gang members was still found to be an active gang participant at time of crime. In this case, Detective Sample testified that due to an increase in law enforcement actions against gangs, gang members are now less likely to have visible gang tattoos.

The jury also was not required to credit Sisneros' self-serving statement denying that he was an active Norteno gang member. (*People v. Silva* (2001) 25 Cal.4th 345, 369 [a rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving].) This is particularly so in light of Sisneros' claim that he was in the back of Duran's car sleeping during the attack and did not wake up until the police pulled over the car. Sisneros' explanation was, to say the least, highly improbable given the uncontradicted evidence that Fordyce had been eating nachos when he was attacked and Sisneros was arrested with a nacho cheese stain on the front of his white shirt. Sisneros' palm print was also found on the driver's side door of Fordyce's car.

The jury heard Sisneros' implausible explanation when it considered the evidence of his police interrogation, and obviously rejected his contention that he did not assault either Fordyce or Lozano that night. It rationally could have done the same with Sisneros' statement that he was not a Norteno gang member.

Sisneros also appears to fundamentally misapprehend our role in deciding a sufficiency of the evidence challenge on appeal. We do not view the evidence in the light most favorable to him, as he has done, but rather in the light most favorable to the judgment. We must reject a sufficiency of the evidence challenge if, after reviewing the whole record in the light most favorable to the judgment, there is any hypothesis that would support a conviction. (*Hill, supra,* 17 Cal.4th at pp. 848-849; *Bolin, supra,*

58

18 Cal.4th at p. 331; *Massie, supra,* 142 Cal.App.4th at p. 371.) Under that exacting standard, Sisneros' challenge falls short.

Duran argues that if we disregard his statements that he was a Norteno gang member in response to jail classification questions, the record lacks sufficient evidence to establish his active gang participation. Even without his jail classification responses, and even if we disregard the juvenile robbery adjudication evidence, we still conclude the record contains sufficient evidence establishing that Duran was an active Norteno gang member.

Duran attacked Fordyce and Lozano while in the company of several Norteno gang members. Defendants repeatedly yelled "Norte" or "Norteno" during the attacks. Detective Sample opined the crimes were gang-related. In an attempt to communicate with someone in the next room while being questioned by police for the charged offenses, Duran yelled out "Norte."

While in jail Duran and several Norteno gang members assaulted another Norteno member who wanted to drop out of the gang. Duran himself acknowledges that the jail assault evidence was highly probative of his active participation as a Norteno gang member. This evidence established that during and after the charged crimes, Duran engaged in violent criminal conduct with other Norteno gang members. Based on this evidence, the jury reasonably could have found that Duran was an active gang participant even if the trial court had excluded Duran's jail classification responses.

While it is not entirely clear whether Vasquez raises this same issue, since his reply brief concedes that "he and two fellow gang members beat up two people and threatened a third," we nevertheless briefly discuss the evidence of Vasquez's active gang participation. Similar to his codefendants, we find that ample evidence supports the jury's finding that Vasquez actively participated in the Norteno criminal street gang within the meaning of section 186.22, subdivision (a).

Vasquez had been contacted by the Sacramento Police Department on multiple occasions associating with Norteno gang members, including during a 2009 homicide investigation. Vasquez often wore red clothing consistent with Norteno-style dress during these contacts. Vasquez had also previously been shot at a party, which Detective Sample opined was gang-related.

Vasquez admitted the "RVN" tattoo on his chest stood for the Richardson Village Nortenos. His brother, Luis Vasquez, had a similar "RVN" tattoo and was in the car with Vasquez when he was arrested in this case. (See e.g., *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331 [expert testimony based on a review of booking photos showing the defendant's tattoos constitutes substantial evidence that defendant was an active gang member for purposes of § 186.22, subd. (a)].)

Numerous photographs showing Vasquez with other Norteno gang members, including ones from West Sacramento, were posted on his MySpace page. In the photos, Vasquez and the others are wearing red clothing and are throwing gang signs with their hands. Several of the pictures were taken at the funeral of a well-documented Norteno gang member. While in jail on the present charges, Vasquez passed a kite to another inmate containing information about Norteno "curriculum," including a structured training process for the gang.

The jury was amply justified, based on the above evidence, in finding defendants were active gang participants under section 186.22, subdivision (a).

DISPOSITION

The judgment for each defendant is affirmed.


      HULL      , Acting P. J.


We concur:


      ROBIE      , J.


      HOCH      , J.